Filed 8/24/15  P. v. Perez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065837 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS266889) |
| CHRISTIAN JASON PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Theodore M. Weathers, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Julie L. Garland, Assistant Attorneys General, Peter Quon, Stacy Tyler and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christian Jason Perez of attempted robbery (Pen. Code,[1] §§ 644/211; counts 1 through 3) and found true allegations he committed the attempted robbery of count 3 "for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b).) The trial court ordered defendant to serve 365 days in local custody with credit for 300 days plus 300 days of section 4019 credits, and ordered him to pay various fines and fees. It suspended imposition of sentence and placed defendant on probation for five years. On appeal, defendant raises instructional error, contending the court violated his state and federal due process and fair trial rights by (1) instructing the jury with the prosecutor's proffered pinpoint instruction concerning an eyewitness identification expert's testimony; (2) improperly denying his request for a curative instruction relating to CALCRIM No. 358 regarding a defendant's out-of-court statements; and (3) instructing the jury with CALCRIM No. 315 that it could consider a witness's level of certainty when evaluating eyewitness identification. Defendant additionally contends the trial court erred by admitting into evidence an irrelevant and prejudicial photograph of one of his friends. We affirm the judgment.

---

[1]     Statutory references are to the Penal Code unless otherwise specified. Because one of the assailants is named Ruben Perez, we refer to Christian Perez as defendant throughout.

FACTUAL AND PROCEDURAL BACKGROUND

*Count 3 Attempted Robbery*

On February 6, 2013, Ivan Gonzalez and his brother Jonathan Escobar were preparing to use a pay phone by a fast food establishment in National City when three men pulled up in a gold vehicle. The passengers displayed gang signs, flipped off Gonzalez, and said, "Old Town National City." In return, Gonzalez flipped them off and waived them away. The vehicle immediately pulled over and the men approached Gonzalez and proceeded to punch and kick him while another instructed the men to get Gonzalez's wallet. Escobar interceded, grabbing a knife from one of the men. The men then left in the car, one of them yelling, "This is Old Town." Gonzalez sustained injuries to his face and body.

Responding police obtained a description and partial license plate number of the assailant's vehicle and determined it was a gold Infiniti registered to Ruben Perez. The day after the robbery, police showed Gonzalez and Escobar a photographic lineup containing a two-year-old photo of Ruben Perez; Gonzalez picked two photos, one of which was Ruben Perez's, and told police it was "between these two, but I think it's this one," indicating Ruben Perez. Gonzalez told police he thought the man was fatter or chubbier at the time. Escobar selected the same two photographs, and also told police he was leaning toward Ruben Perez's photo. Escobar described the driver and rear passenger as Hispanic. He told police the vehicle's driver was maybe six feet tall and 190 pounds with a mustache; the front seat male passenger was 19 or 20 years old, five feet 11 inches tall, and 180 pounds; and the rear passenger was 18 or 19 years old, five feet

3

nine inches tall, and 120 to 130 pounds with a shaved head and goatee. According to Escobar, the front seat passenger had slicked back black hair, a "bulldog" look to his face, and a scar or mark on one cheek.

An employee of the fast food establishment who had seen the robbery also selected Ruben Perez's photograph, saying, "I think this is him, but he's chunkier." She described the three assailants as Hispanic men between the ages of 18 and 25. Two were chubby and between five feet five inches and five feet six inches tall, and the third was "skinny and a little shorter." One of the men was bald.

Officers contacted Ruben Perez, who used the gang moniker "Slaughter," and found clothing and other items with gang-associated logos. They also investigated Ruben Perez's known contacts and found a November 9, 2012 field interview report indicating Ruben Perez was with defendant and defendant's brother and that Ruben Perez was a friend. The report described defendant as five feet nine inches tall, and 203 pounds. Defendant has two moles underneath his left eye and left cheek area. Officers prepared a photo lineup with defendant and showed it to Gonzalez, who handed the photograph of defendant to the officer and confidently said, "This is the guy." He told the officer that defendant was the front seat passenger. That same day, an officer contacted defendant. Defendant had Ruben Perez's tattoo parlor's business card in his wallet, as well as a gang-related ink drawing containing the words "Grudge Lowk." Defendant's right pinky knuckle was red with recent swelling, and he had the word "Grudge" tattooed on his left foot.

4

At trial, though both Escobar and Gonzalez acknowledged pointing to and initialing defendant's photo for police, neither could identify defendant as one of the assailants.

*Counts 1 and 2 Attempted Robberies*

On August 25, 2013, Evandare Aganon and Renmel Leones, both stationed in the Navy, had been out for drinks and food and were walking in National City to their motel when two Hispanic men approached them. One of the men, who Aganon described as five feet 11 inches tall and chubby with short hair, walked in front of Aganon and told him to empty his pockets. Aganon kept walking but the man then threw him to the ground. The other man, who Leones identified at trial as defendant, moved in front of Leones and demanded he empty his pockets. When Leones told him to go away, defendant punched Leones in the face. Leones flagged down a police car. A witness to the assault that night was able to direct responding officers to the car driven by the assailants, a gold Infiniti later found to be registered to Ruben Perez. The hood of the car was warm to the touch and its keys were left in the ignition.

Later that morning, an officer showed Leones two photographic lineups, one including a photograph of Perez and the other containing defendant's photo. Leones identified defendant, telling the officer he was "100 percent sure" he was the person. Leones initialed the photograph and wrote "100 percent" on its side. Leones could not identify anyone in the other photographic lineup containing Ruben Perez's photo. Police arrested defendant in August 2013, telling him he was under arrest for attempted robbery. Though the arresting officer did not give defendant any details about the crime, according

5

to the officer's report defendant responded that it wasn't him, and that "he doesn't even go to National City anymore."

*Gang Evidence as to Count 3*

The People presented a National City police officer to testify about criminal street gangs and the Old Town National City (OTNC) street gang in particular. He opined that Ruben Perez was an OTNC member, but defendant was merely a "hang-around:" someone who follows the gang lifestyle but is not committed to any gang. Responding to hypothetical questions, the officer testified that a person participating in circumstances similar to the count 3 attempted robbery would be performing those acts for the benefit of, or done in association with, the OTNC gang with the intent to promote, further or assist criminal activity by the gang members.

*Defense Evidence*

Defendant testified at trial that he did not consider Ruben Perez a friend; that he had met him about 10 to 15 times before. Defendant said he was with Ruben Perez in November 2012 because he was visiting his brother at the house of defendant's longtime friend, Ignacio Cervantes, and Perez happened to be there. Ruben Perez gave defendant his business card after they talked about tattooing. Defendant denied being with Ruben Perez on February 6, 2013, or ever being inside his car. Defendant testified that on the day he was arrested for the February 2013 offense, his pinky finger was swollen because of a prior car accident injury. He also denied any involvement in the August 2013 attempted robberies, claiming he was asleep at the time. Defendant denied being with Ruben Perez or being in National City that morning. According to defendant, the same

6

two officers who had arrested him in February came to arrest him for the August 2013 incident, so he said to them, "You guys again? I don't even go to National City." Defendant testified he thought the officers were arresting him in August for the February case.

Psychologist Mitchell Eisen, an expert on eyewitness memory and suggestibility, testified that stress or trauma can affect one's attention, perception or memory of an event, as well as a person's estimation of time. He explained that when a person is given more things to think about, known as increased "cognitive load," that cognitive load can lead to problems with attention, perception and memory. Dr. Eisen testified that in general, memory is better and more complete the closer in time to the event; that a steep drop-off in recall occurs in the first hours and days afterwards, then it plateaus and degradation becomes less over time. Also, as time passes, a person is exposed to more information that might cause him or her to change their memory. Dr. Eisen testified that research showed people tend to commit to their identification of an offender, and that when someone commits to a picture, he or she comes to see that person as the perpetrator whether correct or not. According to Dr. Eisen, mistaken identifications could be made with the same degree of confidence as accurate identifications, and thus it is difficult to tell the difference between two well-meaning people who are both 100 percent confident in their choice of the perpetrator, though one is mistaken and one is not. Dr. Eisen testified that he did not interview any of the witnesses in the case and it would not have helped because he was not testifying that anyone had a good or bad memory, or was right or wrong. He explained that "the jurors are in the best position to do that."

DISCUSSION

## I. *Instructional Error*

### A. *General Principles Regarding Jury Instructions*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) A court may also have a duty to give instructions requested by the parties, but it may properly refuse a proffered instruction "if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30; see *People v. Boyce* (2014) 59 Cal.4th 672, 706.) In reviewing challenges to a jury instruction as incorrect, we evaluate the instructions given as a whole, not in isolation. (*People v. Moore* (2011) 51 Cal.4th 1104, 1180.) If the instruction is ambiguous, we look to whether there is a reasonable likelihood the jury misunderstood and misapplied the instruction. (*Ibid.*)

If a court instructs the jury with an incorrect statement of law, a defendant's failure to object or request clarifying or corrective language does not forfeit an appellate challenge to that instruction, if the defendant's substantial rights are affected. (*People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7; *People v. Barker* (2001) 91 Cal.App.4th 1166, 1173; see § 1259 ["The appellate court may . . . review any instruction given, . . .

8

even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].)

B. *Prosecutor's Pinpoint Instruction Regarding Eyewitness Expert's Opinion*

At some point during the trial,[2] a juror submitted the following note: "If a witness was to identify a suspect in a photo line-up a day after the event and a year later came to court and is asked if they recognize anyone in court and they say no. [*Sic*.] Which would you take as a more accurate answer."

During the jury instruction conference, the prosecutor proposed a pinpoint instruction relating to Dr. Eisen's testimony. Defense counsel objected that the topic of the instruction was adequately covered by other instructions, but later limited her objection to the instruction's second sentence, which told jurors they were not to speculate about whether the expert held an opinion regarding any of the identifications in that case or what his opinion might be. Observing that the jury had expressed an interest in Dr. Eisen's opinion, but that Dr. Eisen had avoided giving an opinion about his belief as to the accuracy of the witnesses' identifications, the court agreed to give the instruction, ruling it did not incorrectly state the law or unnecessarily highlight Dr.

---

2      The juror's note is filed stamped March 13, 2014, the day before Dr. Eisen testified, but the parties dispute the accuracy of that date stamp. During the jury instruction conference, the prosecutor sought to make a record that the note was given on Friday, March 14, 2014, while Dr. Eisen was testifying. Defense counsel did not correct that statement. There is no indication in the record that the court answered the juror's question.

Eisen's testimony.[3] The court later modified the instruction slightly. It instructed the jury with CALCRIM No. 226 regarding credibility of witnesses, CALCRIM No. 315 regarding eyewitness identification testimony, and CALCRIM No. 332 regarding expert testimony,[4] then gave the pinpoint instruction as follows: "Expert testimony has been presented regarding factors which may affect an eyewitness identification. You are not to speculate as to whether the expert holds an opinion regarding the accuracy of any of the eyewitness identifications in this case or what such opinion might be. [¶] You may give the testimony of the expert whatever weight you find it to be entitled. As jurors, you may decide the extent to which such testimony is to be applied to the eyewitness identifications in this case."

Defendant contends the court erred by instructing the jury with the proffered and later modified pinpoint instruction. He argues the instruction was unnecessary in that the

---

[3] In part, the court stated, "I don't think I would have given it but for the juror's question. Clearly, the jury is thinking about the opinions of the expert."

[4] The court instructed the jury with CALCRIM No. 332 as follows: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. [¶] In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. [¶] An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

10

juror's question was not directed at Dr. Eisen's testimony, and even if it was, it "singled out" and undermined Dr. Eisen's testimony because CALCRIM No. 332 covered the subject, and Dr. Eisen had already testified that his opinion did not matter but it was for the jury to judge the accuracy of the eyewitnesses' testimony. Defendant also contends the instruction violated his constitutional rights to due process and a fair trial because it "improperly targeted the essence of [Dr. Eisen's] testimony as to identification and memory," causing "irreparable damage" to his identity defense.

Defendant's contention, in substance, is that the pinpoint instruction was cumulative or duplicative. We concede that a court may refuse a proposed instruction if it is duplicative of other instructions. (*People v. Lucas* (2014) 60 Cal.4th 153, 285.) However, no other instruction informed the jury that it was not permitted to speculate about whether Dr. Eisen, the designated eyewitness identification expert, had an opinion about any of the witnesses' believability. Irrespective of whether the juror submitted the note before or during Dr. Eisen's testimony, the jury plainly sought outside input on the accuracy of some of the identification testimony in this case, so the court properly instructed the jury that it should not speculate about Dr. Eisen's opinion in that regard.

We disagree the pinpoint instruction undermined Dr. Eisen's testimony. Defendant points to his counsel's objection that the instruction foreclosed the jury from using the information Dr. Eisen provided to them as to factors that may impact an eyewitness identification. But in our view, the pinpoint instruction cannot in any way be reasonably interpreted as telling the jury to disregard Dr. Eisen's testimony about memory and identification. Rather, the instruction correctly stated the law in circumstances when

11

an expert testifies about psychological factors affecting eyewitness identification, and declines to express opinions about particular witnesses at trial. (See *People v. McDonald* (1984) 37 Cal.3d 351, 361-362, 370-371, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 910, 914.) *McDonald* recognized that an expert witness on identification may not seek to take over the jury's task of judging credibility or tell the jury that any particular witness is or is not truthful or accurate, but he or she may "inform[ ] the jury of certain factors that may affect such an identification in a typical case; and to the extent that it may refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness." (*McDonald*, at pp. 370-371.) The jurors retain the power and duty to judge the credibility and weight of all testimony in the case. (*Id.* at p. 371.) Considering the instructions given in this case as a whole, particularly as to the jury's power and duty to judge the credibility and weight of all testimony including eyewitness testimony, we conclude they were correct, and defendant has not shown error by the giving of the pinpoint instruction.

B. *Defendant's Request for a Curative Instruction Relating to CALCRIM No. 358*

    1. *Background*

The trial court instructed the jury with an adapted version of CALCRIM No. 358 as follows: "You have heard evidence that the defendant made an oral or written statement before the trial. You must decide whether the defendant made any such statements in whole or in part. If you decide that the defendant made such a statement,

12

consider the statement along with all the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statement. [¶] Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

During closing arguments, the prosecutor discussed defendant's alleged statement to police, "I don't go to National City anymore," pointing out defendant denied saying that but one of the arresting officers heard it and recorded the statement in his report. In the defense closing argument, counsel responded to that point, telling the jury that CALCRIM No. 358 instructed jurors to consider a defendant's statements tending to show his guilt with caution unless the statement is written or otherwise recorded. Defense counsel argued, "They don't mean written in a police report, a hearsay document you don't even get . . . to look at. They are talking about written or recorded, like audio-record[ed], video-recorded, or written in his words. And you don't have any of that." The prosecutor in rebuttal argued that the instruction did not say audio- or video-recorded but only "recorded," and that the jury should "[c]onsider the source of who claims he didn't make that statement."

After the jury retired to deliberate, defense counsel raised the issue with the trial court, stating she felt the prosecutor had misstated the law in her argument about the defendant's statement being recorded by the officer: "[The prosecutor's] argument that they can consider the officer's recording of [defendant's] statement as evidence of his guilt per [CALCRIM No.] 358 is an incorrect statement of the law. I mean, cases talk about the fact that it's the defendant's writing or the defendant's recorded statement, not

13

[¶] . . . [¶] someone else's. It's a guard against hearsay. And the guard against hearsay, with regard to the defendant's having written it or said it on his own, or being audio-recorded while saying it, is the fact that, you know, the jury can see it in his own writing, or they will see him on a tape or an audio recording making the confession. [¶] But . . . arguing that the officer recorded it in his report, which is hearsay and not in front of them, or that he recorded it in some writing and now can testify to it, and they can use that as [CALCRIM No.] 358—I think that's an improper statement of the law."

At the court's invitation, defense counsel the next morning proposed the following curative instruction: "Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written by the defendant or otherwise recorded by the defendant in his own words." The court declined to give the instruction, stating it did not believe it was necessarily a correct statement of the law. Defense counsel then proposed the court advise the jury that the "written or otherwise recorded" phrase did not include being recorded in a police report. The court again declined, observing the jury was entitled to give the defendant's statement whatever weight it wanted, and that defense counsel had argued the jurors should not consider it.

2. *The Law Pertaining to a Defendant's Out-of-Court Admissions*

At the time of defendant's trial, the law provided that when evidence is admitted establishing that the defendant made an oral admission, the court must instruct the jury sua sponte that evidence of a defendant's unrecorded, out-of-court oral admissions should be viewed with caution. (*People v. McKinnon* (2011) 52 Cal.4th 610, 679; *People v.*

14

*Slaughter* (2002) 27 Cal.4th 1187, 1200 (*Slaughter*).).)[5] "The purpose of the cautionary language . . . is to assist the jury in determining whether the defendant ever made the admissions. [Citations.] For this reason, the cautionary language is inapplicable to defendant's *recorded* admissions." (*McKinnon*, at p. 679.) Thus, in *Slaughter*, the court stated that "this cautionary instruction should not be given if the oral admission was tape-recorded and the tape recording was played for the jury." (*Slaughter*, at p. 1200; see also *People v. Linton* (2013) 56 Cal.4th 1146, 1197.)

Characterizing his proposed instruction as a "pinpoint" instruction, defendant contends that by refusing his requested instruction modifying CALCRIM No. 358, the court impermissibly validated the police officer's written rendition of his statement and "the jury was ultimately instructed it need not view [his] out-of-court statement with caution since the statement was *recorded* by a police officer in the police report, a hearsay document rather than with safeguards in place by appellant's own writing or, as noted, via an audio or video recording." He states that "although it may not be the law that the word *recorded* in CALCRIM No. 358 envisions a situation in which a defendant's statement is either audio- or video-recorded or written by the defendant himself, such an interpretation would flow logically from the scenario at hand ensuring due process and a fair trial." According to defendant, because the testimony about his statement was conflicting, the court's refusal to instruct was federal constitutional error

---

5    During defendant's appeal, the California Supreme Court abrogated *Slaughter* and held that a court should provide such an instruction only upon request. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1190-1191.)

15

requiring reversal under *Chapman v. California* (1967) 386 U.S. 18, but requires reversal under either *Chapman* or the state standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

The People respond that where a statement is contemporaneously transcribed, it meets *Slaughter*'s standards. They continue that even if the court erred by refusing the instruction, there was no prejudice under the appropriate *Watson* standard as the absence of a curative instruction does not render a trial fundamentally unfair. According to the People, any error would be harmless because the court instructed the jury with CALCRIM No. 358; the parties' closing arguments did not conflict with that instruction but even if they did, the court told the jury it was to follow the court's instructions; defendant's statement merely showed consciousness of guilt for one robbery and was not a direct admission of criminal liability; and ample evidence apart from the statement established defendant's guilt.

We view as dispositive defendant's admission concerning the state of the law as to the word recorded in CALCRIM No. 358. We have found no authority, and defendant cites none, that *requires or limits* the type of recording referred to in CALCRIM No. 358's cautionary language to audio or video recordings, or written recordings by the defendant. If the law does not support defendant's requested clarification of CALCRIM No. 358, the trial court did not err by refusing it. But we agree with the People that defendant has not demonstrated prejudice in any event, which we assess under the standard for state law error, that is, "whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given."

16

(*People. v. Diaz, supra*, 60 Cal.4th at p. 1195; accord, *People v. Dickey* (2005) 35 Cal.4th 884, 905 ["The standard of review for erroneous failure to give the cautionary instruction is 'the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given' "].)

Here, there is no indication that defendant was prevented from presenting his theory regarding how the jury should view his out-of-court statement. His counsel argued that in keeping with CALCRIM No. 358, the jury was still required to view his alleged inculpatory statement with caution, and that did not change because a police officer wrote it down. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144-1145 [if failure to give pinpoint instruction was error, it was harmless because nothing in the given instructions precluded jury from adopting the defense theory, which was fully covered in counsel's argument]; *People v. Franco* (2009) 180 Cal.App.4th 713, 720 [when assessing claim of instructional error, appellate court considers the record as a whole, including arguments of counsel].)

Additionally, even setting aside defendant's statement, the jury heard persuasive evidence of his guilt: the officers who administered the photographic lineups testified about the victims' certainty about their identification of defendant as the assailant, and the jury obviously credited those identifications. Finally, the court provided the jury with other instructions that bear on the jury's assessment of defendant's out-of-court statement, including CALCRIM Nos. 226 and 315 regarding the credibility and believability of witnesses and eyewitnesses. (See *People v. Diaz, supra*, 60 Cal.4th at p. 1196.) Those

17

instructions advised the jurors to consider how well the witness could see and hear and how well the witness was able to remember and describe what happened.  There is no reason to believe the jury would have discredited the officer's testimony regarding defendant's statement had the trial court given his proposed instruction.  We conclude it is not reasonably probable defendant would have received a more favorable verdict had the court given the instruction.  While defendant presented a conflicting version of his statement, we conclude in any event it is not reasonably probable that giving the modified cautionary portion of CALCRIM No. 358 would have affected the jury's resolution of the conflict given the state of the evidence and the instructions the court in fact provided.  (See *Diaz, supra,* 60 Cal.4th at p. 1195.)  For all of these reasons, defendant has not shown prejudice.

C.  *Instruction with CALCRIM No. 315*

Defendant contends the trial court erred when it instructed the jury with CALCRIM No. 315 regarding how it should evaluate eyewitness testimony.[6]  In

---

6       CALCRIM No. 315 reads:  "You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.  [¶]  In evaluating identification testimony, consider the following questions:  [¶]  • Did the witness know or have contact with the defendant before the event?  [¶]  • How well could the witness see the perpetrator?  [¶]  • What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation[, and _____ *<insert any other relevant circumstances>* ]?  [¶]  • How closely was the witness paying attention?  [¶]  • Was the witness under stress when he or she made the observation?  [¶] • Did the witness give a description and how does that description compare to the defendant?  [¶]  • How much time passed between the event and the time when the witness identified the defendant?  [¶]  • Was the witness asked to pick the perpetrator out of a group?  [¶]  • Did the witness ever fail to identify the defendant?  [¶]  • Did the

18

particular, he challenges that portion of the instruction telling the jury it may evaluate the witness's certainty in making the identification, arguing research has shown that a witness's certainty has little correlation with the accuracy of his or her identification. Defendant acknowledges that both the California and United States Supreme Courts have approved the use of the witness's certainty as a factor in evaluating eyewitness identification. (*People v. Johnson* (1992) 3 Cal.4th 1183 [approving CALJIC No. 2.92, the predecessor to CALCRIM No. 315]; *Neil v. Biggers* (1972) 409 U.S. 188.) However, he maintains *Johnson* did not consider whether the certainty factor violated the state or federal Constitutions. He also maintains that since *Biggers* was decided, other state courts (*State v. Guzman* (Utah 2006) 133 P.3d 363; *State v. Long* (Utah 1986) 721 P.2d 483; *Brodes v. State* (Ga. 2005) 614 S.E.2d 766; *Commonwealth v. Santoli* (Mass. 1997) 680 N.E.2d 1116) have questioned the validity of the certainty factor.[7] Defendant points out that Dr. Eisen testified about some of these studies, but despite this research, "in retaining the certainty element in CALCRIM No. 315, California clings to an outdated notion and instructs juries that a witness who is certain of his or her identification is

_____

witness ever change his or her mind about the identification? [¶] • How certain was the witness when he or she made an identification? [¶] • Are the witness and the defendant of different races? [¶] • [Was the witness able to identify other participants in the crime?] [¶] • [Was the witness able to identify the defendant in a photographic or physical lineup?] [¶] • [_____ <*insert other relevant factors raised by the evidence*>.] [¶] • Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

7       We decline to consider these cases, as we are not bound to follow out-of-state decisions. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490.)

likely to be correct." Thus, he argues, where a case hinges on eyewitness identification as does this case, the instruction violates due process.

We elect to consider defendant's contention even though he did not object or suggest any modification to CALCRIM No. 315. (*People v. Smithey*, *supra*, 20 Cal.4th at pp. 976-977, fn. 7; § 1259.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; see *People v. Ngo* (2014) 225 Cal.App.4th 126, 149; *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 646.)

Nevertheless, we reject his contentions under settled California Supreme Court authority approving the instruction with its certainty factor, to which we are bound. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The California Supreme Court long ago decided *People v. McDonald*, *supra*, 37 Cal.3d 351, and in that case acknowledged the very scientific proposition that defendant advances: that "the majority of recent studies have found no statistically significant correlation between confidence and accuracy." (*Id*. at p. 369.) Thus, the court was plainly aware of such studies when four years later it approved CALCRIM No. 315's predecessor instruction, which included a certainty factor. (*People v. Wright* (1988) 45 Cal.3d 1126 [CALJIC No. 2.92 "should be given when requested in a case in which identification is a crucial issue and there is no substantial corroborative evidence"].)

The California Supreme Court later rejected a direct challenge to the instruction's certainty factor in *People v. Johnson* (1992) 3 Cal.4th 1183, finding no error in the eyewitness certainty instruction despite the fact that the defense had presented expert testimony "without contradiction" at trial that "a witness's confidence in an identification does not positively correlate with its accuracy." (*Id*. at p. 1231.) And more recently in *People v. Ward* (2004) 36 Cal.4th 186, the high court rejected the defendant's contention that the trial court erred by declining to modify the level-of-certainty factor in the instruction to better reflect the scientific principles concerning certainty, stating the court had no duty to sua sponte modify the instruction in such a manner and rejecting the defendant's constitutional challenges. (*Id*. at pp. 213-214.) As stated, we are bound by the decisions of our state Supreme Court. Additionally, we observe that the U.S. Supreme Court has not altered its position on the certainty factor; in *Perry v. New Hampshire* (2012) ___ U.S. ___ [132 S.Ct. 716, 724-725 & fn. 5], the court continued to refer to the factors set out in *Neil v. Biggers*, *supra*, 409 U.S. 188, including the certainty factor, as properly considered in evaluating the reliability of eyewitness identifications. In short, defendant provides no basis to conclude the trial court erred by giving CALCRIM No. 315 with its certainty factor.

We observe the reading of the certainty factor in CALCRIM No. 315 did not foreclose or limit defendant's closing argument as to the credibility of the victims' identifications. The instruction also identified other factors on which defense counsel relied—the witness's opportunity to observe the perpetrator of the act and the stress to which the witness was subjected at the time of the observation. And elimination of the

21

certainty/uncertainty factor would not have prevented the prosecution from relying on the victims' certainty, as the instruction allows the jury to consider "any other circumstances affecting the witness's ability to make an accurate identification." Thus, the court's giving of an unmodified version of CALCRIM No. 315 was not prejudicial under either state or federal prejudice standard.

## II. *Admission of Ignacio Cervantes's Photograph into Evidence*

Following the prosecution's case and outside the jury's presence, the People asked to admit People's exhibit No. 48, a photograph of Ignacio Cervantes, into evidence. Following defense counsel's relevance objection, the prosecutor explained that defendant had identified the person in the photograph as Cervantes and described him as his "longterm" friend. The prosecutor stated she wanted the jurors to know the exhibit reference, and its relevance was that defendant had confirmed he saw the picture and who was depicted in it. The court admitted the photograph, telling the jury: "The court also, while you were on break, was asked to receive the last photograph that was identified by a witness. That was People's 48, and the court did receive People's 48 into evidence. So that is also evidence in this case."

Defendant contends the court prejudicially erred by admitting the photograph into evidence; that it was irrelevant to any issue in the case and rose to the level of evoking an emotional bias against him because it emphasized his gang connections. We disagree. Relevant evidence under Evidence Code section 210 is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "logically, naturally,

22

and by reasonable inference" to establish material facts such as identity, intent, or motive. (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117, 127.) Except as otherwise provided by statute, all relevant evidence is admissible (Evid. Code, §§ 350, 351; see also Cal. Const., art. I, § 28, subd. (d)), and the court has broad discretion to judge relevance. (*People v. Cash* (2002) 28 Cal.4th 703, 727.)

In this case, the prosecution sought to connect defendant with Ruben Perez, who owned the gold Infiniti that was spotted by witnesses and police during and after the offenses. Defendant's testimony was that he met Perez and obtained his business card at Cervantes's house while defendant was visiting his own brother. And defendant claimed that during the day on August 25, 2013, he was with Cervantes. On cross-examination, the prosecutor asked if defendant knew that Ruben Perez and Cervantes knew each other or had been in contact with each other, and he replied that he "had no idea." However, defendant confirmed he did not have to introduce Ruben Perez to Cervantes; that Perez showed up to Cervantes's house on his own. We conclude the trial court did not err by admitting into evidence Cervantes's photograph, which was relevant to show defendant's familiarity with Cervantes, and to tend to show a connection to Ruben Perez and the attempted robberies.

Nor can we ascertain any prejudicial effect of the photograph in light of the other evidence. A court, in its discretion, may exclude relevant evidence "if its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, italics added.) "Prejudice for

23

purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.)

We have already rejected the premise of defendant's argument that the photograph had no relevance for balancing against its potentially prejudicial effect. Defendant suggests the photograph depicts Cervantes's tattooed face and/or neck, and bolstered his gang affiliation. But at trial, defendant testified that Cervantes had a tattoo across his neck reading, "Cali" or "Califa." Thus, the photograph depicting Cervantes's tattoos was cumulative at best. Defendant's argument as to prejudice is, in effect, that the evidence was cumulative: that "there was already enough evidence of appellant's connection to the gang" and the prosecutor "emphasized [his] gang connections." But even assuming the photograph of Cervantes demonstrates some connection with defendant to a criminal street gang, it was relevant to prove something other than the defendant's disposition to commit crimes, and thus was not inadmissible. (See, e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 131 [evidence showing the "workings and activities" of a gang, as well as photos of defendant's gang tattoos, was not inadmissible character evidence because it was relevant to motive and identity].) Even assuming the photograph was admitted to show defendant acted in association with and for the benefit of a criminal street gang, it was neither error nor prejudicial, as defendant does not challenge on appeal the gang enhancement imposed on count 3.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.